# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00228-COA

**DEMARIO WALKER A/K/A DEMARIO DONTEZ WALKER A/K/A KIRIYAMA SAN GIVONNI A/K/A KIRIYAMA ZYREONIA SAN GIVONNI**                                      APPELLANT

v.

**STATE OF MISSISSIPPI**                                      APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 02/24/2020 |
| TRIAL JUDGE: | HON. DALE HARKEY |
| COURT FROM WHICH APPEALED: | GREENE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: W. DANIEL HINCHCLIFF DEMARIO WALKER A/K/A DEMARIO DONTEZ WALKER A/K/A KIRIYAMA SAN GIVONNI A/K/A KIRIYAMA ZYREONIA SAN GIVONNI (PRO SE) |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAUREN GABRIELLE CANTRELL |
| DISTRICT ATTORNEY: | ANGEL MYERS McILRATH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/07/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., GREENLEE AND SMITH, JJ.

### CARLTON, P.J., FOR THE COURT:

¶1.    Demario Walker was convicted of making "False Representations to Defraud Government" in violation of Mississippi Code Annotated section 97-7-10 (Rev. 2014), which punishes anyone who, "with intent to defraud the state or . . . [a] subdivision of state or local government, knowingly and willfully . . . makes or uses any false writing or document

knowing the same to contain any false, fictitious or fraudulent statement or entry. . . ." Walker was sentenced as a nonviolent habitual offender to serve five years in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole under Mississippi Code Annotated section 99-19-81 (Rev. 2015) and ordered to pay a $7,500 fine.

¶2.	Walker appeals his conviction and sentence, asserting that (1) the evidence was insufficient to sustain the verdict because Walker never submitted a fraudulent order to the "Circuit Court [C]lerk of Greene County, Mississippi" as set forth in his indictment; (2) the trial court constructively amended Walker's indictment; (3) the trial court erred when it found that he "opened the door" to allow evidence of other crimes or bad acts; (4) the trial court erred when it denied Walker's motion to dismiss and motion to suppress evidence; (5) the trial court erred when it allowed Walker to represent himself during pretrial and trial proceedings; (6) the trial court erred when it allowed Judge Kathy King Jackson to testify; (7) the trial court abused its discretion by not appointing an investigator to assist in Walker's defense; and (8) Mississippi Code Annotated sections 13-5-1 and 13-5-8 (Rev. 2019) (concerning jury service) are unconstitutional, and Walker's right to a fair cross-section of the community in his jury venire was violated. For the reasons addressed below, we affirm Walker's conviction and sentence.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶3.	Walker[1] was indicted for making and using a fraudulent court order with the intent to

---

[1] Demario Walker legally changed his name to Kiriyama Zyreonia San Givonni in the course of this appeal. By order dated December 10, 2020, a panel of this Court determined

defraud the government in violation of section 97-7-10. The indictment provided that

> DEMARIO DONTEZ WALKER in Greene County, Mississippi, on or between June 15, 2017[,] and June 16, 2017, with the intent to defraud the Circuit Court of [Greene County,] Mississippi, did unlawfully, willfully, feloniously, and intentionally make or use any false writing or document knowing the same would contain false, fictitious or fraudulent statement or entry, to-wit: prepared and submitted to the Circuit Court [C]lerk of Greene County, Mississippi, a court order Granting Motion to Provide Records, Granting Motion for Legal Assistance, and granting Motion for Summary Judgment, which contained the false signature of Judge Kathy King Jackson, contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State of Mississippi.

¶4. On August 14, 2018, Walker was arraigned. Walker was tried in February 2020. Walker represented himself with counsel serving in various capacities as detailed below. Prior to trial, Walker filed in excess of 120 pro se motions, along with subpoenas duces tecum and other preliminary pleadings. Walker also filed a "Motion to Challenge the Array of the Jury" four days before trial. To avoid repetition, the pretrial filings and proceedings relevant to the issues Walker raises on appeal are discussed in their contexts below.

¶5. The jury was seated on February 11, 2020, and after opening statements, the State presented its case-in-chief.

¶6. Alicia Box, the chief records officer for MDOC at the South Mississippi Correctional Institute (SMCI), testified that she held that position in June 2017, and in that position, she

that the style of this case will list Walker's new name, "Kiriyama Zyreonia San Givonni," as an alias. Throughout the record and in much of the appellate briefing, the appellant is referred to as Demario Walker. The Court, therefore, will continue to refer to him by that name for continuity.

commonly received court orders. On June 15, 2017, she received a phone call from someone who identified "herself" as a court official and requested documents from Walker's prison records. Box testified that she "assum[ed]" the person was an African American female. She did not recall the name the caller gave to her. Box said she scanned the documents and forwarded them to the email address provided by the caller (court.docs.orders@usa.com).

¶7.    Later that morning, a response from that email address populated in Box's email inbox with only the document "in the circuit.doc" attached. The attached document was an uncertified order purportedly electronically signed by Senior Circuit Judge Kathy King Jackson, vacating the sentence of inmate Horace Ervin (the *Ervin* order). Box responded to the email and informed the sender that she would forward the email to MDOC's records office, which typically handled orders for vacated sentences.

¶8.    The next morning, Box received another email from the same sender with the document "order(1).doc" attached. The attached document was another uncertified order purportedly electronically signed by Judge Jackson, captioned "*In the Circuit Court of Greene County, Mississippi, Demario D. Walker v Marshall Turner, et al.*, *Cause No. 2017-004*." The order was entitled "Order Granting Motion to Produce Records, Granting Motion For Legal Assistance, and Granting Motion For Summary Judgment" (the *Walker* order). The *Walker* order is the order described in Walker's indictment. The *Walker* order provided, among other relief, that "MDOC [R]ecords Director Alicia Box and Jawaski Mallett [are to] provide the Plaintiff, Demario Walker[,] with a full and complete copy of his prison record

4

. . . at no cost to [Walker] upon receipt of this order or not less than 14 days." Again, Box forwarded the order to MDOC's records office.

¶9.     Box testified that she then notified her supervisor because it was unusual for her to receive these types of orders and requests by email. Box and her supervisor alerted MDOC's Criminal Investigations Division (CID) of the situation and turned over the emails and orders from the suspicious sender.

¶10.    Cecelia Bounds, the Greene County Circuit Court Clerk, also testified for the State. She confirmed that she held that position in June 2017. Bounds was shown the State's Exhibit 3, which she identified as a list of calls made on June 16, 2017, to the circuit clerk's phone number. She testified that on that morning she received a phone call in which the caller was asking for information in Walker's case; the call caught Bounds's attention because the caller identification displayed a phone number from a 202 area code that was not a local area code. Bounds said that the caller introduced themself as Walker's representative and asked whether an order had been filed in Walker's case. Bounds told the caller that she did not give that information over the phone and then "the call ended."

¶11.    Bounds testified that later that morning, she received another phone call from the same number. This time, the caller purported to be an MDOC representative. The caller asked whether an order had been filed in Walker's case. While she was on the call, Bounds heard an intercom go off in the background from the caller's end. The intercom set off "red flags" in her mind; it made Bounds think that the caller was "an inmate in the prison." She

testified that she had been to the prison and heard the intercoms going off in that manner. Bounds said she told the caller she did not believe the person worked for MDOC. The caller first argued with her and then hung up on her. Bounds testified that the two phone calls were made by the same person. She also testified that "the voice on the phone that [she] spoke with was very similar to Mr. Walker's" voice. After the phone calls, Bounds contacted Chief Investigator James Cooksey of MDOC's CID and told him that she believed she had received phone calls from an inmate.

¶12. Bounds testified that she then received a phone call from an MDOC official requesting verification of two orders MDOC had received and requesting certified copies of those orders.[2] Bounds identified the State's Exhibit 2 (the *Walker* order) as one of those orders. Bounds testified that she did not have the order in her files, so she asked the official to email the uncertified order to her office. When she got the order, Bounds immediately recognized that the electronic signature on the order was not Judge Jackson's signature—which is large and unique. She also knew that Judge Jackson did nothing electronically, especially not signing an order. In her twenty years at the circuit clerk's office, and her twelve years as the circuit clerk, Bounds testified that she had never seen an electronically signed order from Judge Jackson. Regarding the *Walker* order, Bounds also

---

[2] Although Bounds testified that this phone call came from an actual official at MDOC, she did not identify the individual. Our review of the transcript, however, makes clear that the unidentified official from MDOC was not the same individual who had called Bounds earlier in the morning from a distant area code.

testified that it had a valid numerical style of a case pending in the Greene County Circuit Court, but it was not the correct cause number for "*Demario Walker v. Marshall Turner*," which also indicated to her that it was not a valid order.

¶13. Bounds was also questioned about the State's Exhibit 1 (the *Ervin* order). She testified that this order was the one that the MDOC official called to have verified, and she did not have that order in her files either. She asked the official to email the order to her office. Like the *Walker* order, the *Ervin* order also had Judge Jackson's electronic signature. Bounds testified that she verified through Judge Jackson that she did not electronically sign either of the orders. Judge Jackson also testified that she did not use an electronic signature and that she did not sign the orders.

¶14. After confirming that the orders were fraudulent, Bounds testified that she contacted MDOC and the district attorney's office and informed them that she believed there was a situation that was "of grave concern to the courts and to the Department of Corrections" that needed to be investigated quickly.

¶15. Chief Investigator Cooksey testified that after Bounds told him that an inmate was calling the clerk's office, he contacted his supervisors and relayed the information. He said he was advised that the suspected inmate and his belongings should be searched for the cell phone and that the inmate should be placed in lockdown pending an investigation.

¶16. SMCI inmate Marcus Morris testified that a correctional officer told him to pack Walker's belongings. Officers Adrian Keys and Christopher Woolman, who were instructed

by CID to search Walker, testified that they told the control center to call Walker to the administration area of SMCI's main entrance. Morris testified that he did not find a cell phone while he was packing Walker's belongings. Officers Keys and Woolman searched Walker and his belongings when he arrived at the front of the building. When Walker arrived, he was directed into a holding cell and strip-searched by Officer Keys. Officer Keys discovered a cell phone charger hanging between Walker's legs. The officers then searched Walker's belongings and discovered a cell phone, wrapped in cellophane, inside a coffee cup with coffee in it.[3] Walker was then issued a rules-violation report for his possession of contraband (the cell phone) and sent to lockdown. The officers gave the cell phone and phone charger to CID for further investigation.

¶17. Regarding the contents of the cell phone, Chief Investigator Cooksey testified that he used computer software to extract its contents—the usual practice when cell phones were confiscated from inmates. Chief Investigator Cooksey examined the contents of the cell phone on the extraction report. He also assigned Investigator Russell Houston to the investigation, who also examined the extraction report for the cell phone. The investigators testified that they found text messages and email accounts linking the cell phone to Walker, as well as the fraudulent orders on the cell phone. They also found that the cell phone had been recently used to call the Greene County Circuit Court Clerk's Office and SMCI.

---

[3] At trial, Morris testified that he could not recall whether he packed up a coffee cup in Walker's belongings. On cross-examination, Morris testified it was possible that Walker could have walked to the administration building with the coffee cup.

8

¶18. Investigator Jason Smith, an investigator with the Greene County district attorney's office, also testified for the State. He testified that the extraction report from Walker's contraband cell phone was furnished to the District Attorney's office and that he reviewed it. Like Officers Cooksey and Houston, Investigator Smith testified that he found evidence on the extraction report linking Walker to the cell phone, including text messages, audio recordings, pictures, emails, and word documents that included the fraudulent orders that were sent to MDOC. There was also evidence on the cell phone that Walker had made phone calls recently to SMCI and the Greene County Circuit Clerk's Office, and Investigator Smith testified that there was evidence that Walker was using fake names to file fraudulent tax returns.

¶19. The State rested, and the defense moved for a directed verdict, asserting that Walker was charged under the indictment with preparing and submitting a fraudulent document to the Greene County Circuit Clerk's Office and that the State failed to prove Walker had done so. In response, the State asserted that in viewing the evidence presented in the light most favorable to the State, the State had proved the elements of section 97-7-10, and there was sufficient evidence to submit the case to the jury. Therefore, the State asserted, Walker's motion for a directed verdict should be denied.

¶20. The trial court denied Walker's motion for a directed verdict, as follows:

> The evidence presented thus far I believe establishes a prima facie [case] that the maker of the document, fraudulent document, was the defendant. Circumstances of its use and its submission to the Circuit Clerk here in Greene County are before the jury. And fraudulent intent to commit a fraud upon the

9

clerk or the court here in Greene County is also circumstantial. I think it's sufficient under our law to establish a prima facie case on behalf of the State and I'm going to deny [defendant's] Motion For a Directed Verdict and we will continue with the proof in the defendant's case. It's sufficient to require the defendant to proceed. A fraudulent court document is always a fraud upon the court.

¶21. The defense called two witnesses who essentially testified that they had not seen Walker using a cell phone. Walker also called several witnesses who had already been called by the State, namely Officer Woolman, Chief Investigator Cooksey, Investigator Houston, and Investigator Smith. To avoid repetition, we discuss their testimonies in further detail below.

¶22. Walker also took the stand in his own defense. He admitted he had used the subject cell phone but maintained that he did not own it and that the cell phone was shared by other inmates. Walker said that "because I did and still do own a business, I just send out business[-]related emails [on the cell phone] as it relates to my businesses." Regarding the *Ervin* order, Walker testified he had seen Ervin but did not know him, and Ervin was housed in a different unit. Walker said he was aware that Ervin had "an opportunity" to use the cell phone. Walker testified that he "admit[ted] that the evidence shows that the cell phone was used to create [the orders at issue]," but Walker denied drafting the orders, transmitting the orders, or asking someone else to transmit them. Walker also denied having called Cecelia Bounds (the Greene County Circuit Court Clerk) or the MDOC about the orders.

¶23. The defense rested once Walker concluded his testimony. The State did not present any rebuttal. At the close of all the evidence, Walker renewed his motion for a directed

10

verdict and sought a peremptory instruction. The motion was overruled, and the peremptory instruction was refused.

¶24. The jury found Walker "guilty of fraudulent statements and representations," and Walker's counsel moved for judgment notwithstanding the verdict the same day. The trial court denied Walker's motion on the record and proceeded with sentencing. The trial court sentenced Walker as a nonviolent habitual offender to serve five years in MDOC's custody and ordered Walker to pay a $7,500 fine. On February 28, 2020, the trial court sua sponte entered an order appointing appellate counsel for Walker, and on March 5, 2020, the trial court denied Walker's pro se "Motion for JNOV or for New Trial and for Additional Time to Allow Appellate Counsel to File Post-Trial Motions." Walker appealed.

¶25. Walker's appointed appellate counsel filed a brief on Walker's behalf, and Walker filed a supplemental brief raising additional issues. The State filed its appellee's brief. Walker did not timely file a reply brief.

¶26. Walker subsequently filed several pro se motions, including a pro se motion he filed in June 2021 (about three months after briefing had concluded), seeking permission to supplement his appellant's brief to add a new issue concerning the composition of the jury that was seated for trial. The Court granted Walker thirty days to file a pro se supplemental brief. The State was permitted fourteen days to respond to the supplemental brief.

¶27. After supplemental briefing concluded, Walker filed several pro se motions, including a pro se motion to supplement the appellate record with "all exhibits, reports, papers,

11

documents, affidavits and sworn statements" related to the jury-selection process, composition of grand and petit juries, population makeup, and voter registration rolls in Greene County from January 1, 2015, to December 31, 2020. Our Court denied this motion, observing that because "this information was not made available to the trial court or reviewed by the trial court in the context of this criminal matter, it is not proper for review by this Court in this direct criminal appeal."

## DISCUSSION[4]

### I.    Sufficiency of the Evidence

####     A.    The Information Charged in the Indictment and the State's Burden of Proof

¶28.    Walker asserts that the evidence presented to the jury was insufficient to support the verdict against him because the State failed to prove that he "submitted [a fraudulent order] *to the Circuit Court* [*C*]*lerk of Greene County, Mississippi*" (emphasis added), which is a factual allegation contained in both the indictment and Jury Instruction 3.[5]  To review, Walker's indictment provided that Walker,

> with the intent to defraud the Circuit Court of [Greene County,] Mississippi, did unlawfully, willfully, feloniously, and intentionally make or use any false writing or document knowing the same would contain false, fictitious or fraudulent statement or entry, to-wit: prepared and submitted *to the Circuit*

---

[4] Due to the various issues involved on appeal, the Court will discuss the standard of review applicable to each issue as the issue is addressed.

[5] Although the State addressed both the *Ervin* and the *Walker* orders at trial, we address only the *Walker* order in our discussion because this is the only order identified in Walker's indictment.

12

*Court* [*C*]*lerk of Greene County, Mississippi*, a court order . . . which contained the false signature of Judge Kathy King Jackson, contrary to the form of the statute in such cases[.]

(Emphasis added).

¶29. We find that Walker's assignment of error on this issue is without merit because although "[t]he State has the burden of proof as to all the essential elements of the crime," *Vince v. State*, 844 So. 2d 510, 517 (¶22) (Miss. Ct. App. 2003), the State is not required to prove factual information included in an indictment where that information is not an essential or necessary element of the crime or where the information does not change the crime charged. *Smith v. State*, 250 So. 3d 421, 427-29 (¶¶22-29) (Miss. 2018) ("*Rickie Smith*"); *Smith v. State*, 275 So. 3d 100, 107 (¶20) (Miss. Ct. App. 2019) ("*Rashad Smith*").

¶30. In this case, Walker was charged under section 97-7-10, which provides in relevant part: "Whoever, with intent to defraud the state or any . . . county, . . .or other subdivision of state or local government, knowingly and willfully . . . makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall, upon conviction, be punished . . . ." Thus, to secure a conviction under section 97-7-10, the State was required to prove that Walker either "ma[d]e or use[d]" a fraudulent order with the intent to defraud a state governmental entity.

¶31. As we detail in the sufficiency-of-the-evidence subsection below, we find that there is sufficient evidence in the record to prove that Walker both "ma[d]e" *and* "use[d]" the *Walker* order with the intent to defraud a state governmental entity. Indeed, if Walker

13

"ma[d]e" a fraudulent order with the requisite intent, whether it was submitted to any entity does not matter. Regarding the "use[d]" element of the statute, we find the evidence showed that the *Walker* order was ultimately provided to the circuit court clerk and there was sufficient evidence in the record to show that Walker provided the *Walker* order to MDOC with the fraudulent intent for it be provided to the circuit court clerk.

¶32. And contrary to Walker's assertions, we also find that the State did not increase its burden of proof regarding the "use[d]" element of the statute by naming the Greene County Circuit Court Clerk in the indictment. The rationale in *Rickie Smith*, 250 So. 3d at 427-29 (¶¶22-29), supports our determination on this issue. In that case, a defendant's indictment for armed robbery provided that he had stolen "a playstation, wallet, purse and approximately four hundred dollars" from the victim. *Id.* at 425 (¶15). The evidence at trial, however, showed that the defendant stole the playstation, a red designer belt, and the four hundred dollars. *Id.* at 429 (¶29). The State asserted that it was not required to prove the defendant had stolen every item listed on his indictment for armed robbery. *Id.* at 428 (¶27).

¶33. The Mississippi Supreme Court agreed, finding that although "[t]he State had the burden of proving the essential elements of armed robbery," *id.* at 427 (¶23), the State did not increase its burden of proof when it specifically listed the stolen property in the indictment. *Id.* at 428 (¶24). The supreme court explained that because the identity of the stolen property was "not a necessary element of the crime," *id.*, nor did including the itemization of the stolen property change the crime charged. *Id.* at 427 (¶22).

14

¶34.    We find that the same is true in the instant case.  The first sentence of the indictment already identified the defrauded state entity, charging that Walker, "with the intent to defraud the Circuit Court of [Greene County,] Mississippi," made or used the *Walker* order. We therefore find that the State did not increase its burden of proof to prove the specific state entity when, later in the indictment, the State identified "the Circuit Court [C]lerk of Greene County" as the recipient of the *Walker* order.  This statement was not an element of the crime charged nor did including this statement change the crime charged.

¶35.    Similarly, in *Rashad Smith*, 275 So. 3d at 107 (¶20), this Court concluded that the State was not required to prove a factual allegation included in the defendant's indictment when the particular allegation did not change the crime charged.  Rashad Smith was charged with violating Mississippi Code Annotated section 47-5-193 (Rev. 2015).  Section 47-5-193 makes it unlawful "for any . . . person or offender" to possess a cell phone in a correctional facility.  *Id.* at 105 (¶12).  Smith's indictment contained the factual allegation that he was an inmate at the Lincoln County, Mississippi jail.  *Id.*  Smith contended "that because Count II of the indictment provided that Smith was an 'inmate housed' in the Lincoln County jail, the State was required to prove that [factual allegation], even though this is not a statutory element under section 47-5-193."  *Id.* at 105-06 (¶13).  The Court rejected Smith's contention, finding that "[w]hether Smith was an 'inmate' at the facility or simply a 'person' at the facility does not change the crime charged—possession of a cell phone in a correctional facility. . . . [Therefore,] the State was not required to prove  that Smith was an

15

'inmate' at the Lincoln County jail[.]" *Id.* at 107 (¶20).

¶36.    We note that Walker cites *Cooley v. State*, 803 So. 2d 485 (Miss. Ct. App. 2001), in support of his contention that the State was required to prove that he submitted the fraudulent order to the "Circuit Court [C]lerk of Greene County, Mississippi" because that phrase was contained in the indictment. We find, however, that *Cooley* does not support Walker's argument, and, in fact, *Cooley* lends further support for our determination that the State was not required to prove the particular State entity that received the fraudulent *Walker* order in this case.

¶37.    The defendant in *Cooley* "was charged with aggravated assault by use of a deadly weapon identified as a hatchet" pursuant to Mississippi Code Annotated section 97-3-7(2)(b) (Rev. 2000). *Cooley*, 803 So. 2d at 487 (¶4). Despite the fact that the State specified the deadly weapon in Cooley's indictment (a hatchet), this Court described the State's burden of proof as follows: "[T]he State elected to indict Cooley for aggravated assault with a deadly weapon. It was therefore incumbent upon the State to either prove that an instrument which by its very nature is a deadly weapon was used, or that an instrument . . . was used [that] the jury, as finder of fact, could determine was a deadly weapon." *Id.* at 489 (¶12). Continuing, the Court held that because "[t]here is no testimony that a hatchet *or any other deadly weapon* was used," *id.* at 489 (¶13) (emphasis added), Cooley's simple assault conviction would be reversed and rendered. *Id.* at (¶15); *see also id.* at 488 (¶10) ("There is no evidence *of the use of a deadly weapon* to make this aggravated assault pursuant to section

16

97-3-7(2)(b)." (emphasis added)). In short, the State was held to prove the statutory element of proof (a "deadly weapon") and not the particular weapon used (the hatchet), even though the hatchet was identified in the indictment. *Id.* at 488-89 (¶¶10, 12-13, 15).

¶38. Likewise, in Walker's case, although the State had the burden of proving that Walker intended to defraud a state governmental entity, we find that the State was not required to prove that Walker submitted the fraudulent order to the "Circuit Court [C]lerk of Greene County, Mississippi" because the particular state governmental entity is not a statutory element of proof under section 97-7-10.

¶39. In sum, based upon the caselaw discussed above, we find that the State did not increase its burden of proving that Walker "use[d]" or "ma[d]e" the *Walker* order to defraud a state governmental entity under section 97-7-10 when the indictment included the factual allegation that Walker submitted the fraudulent order to the Greene County Circuit Court Clerk. As the plain language of section 97-7-10 shows, the particular governmental entity receiving the fraudulent order—whether by Walker submitting it to MDOC or to the Greene County Circuit Court Clerk—is not an essential or necessary element of that crime, nor does the particular entity that receives the fraudulent order change the crime charged. We find that Walker's assertions to the contrary are without merit.[6]

---

[6] We also briefly address Walker's contention that the State's motion to amend the indictment "was an admission that the State has failed to prove the elements" of the charge against Walker, and the trial court's "ruling [denying that motion] . . . indicates that it was a substantive element in the indictment and not merely a matter of form."

We find that Walker mischaracterizes the circumstances relating to this issue. Our

17

## B. The Sufficiency of the Evidence

¶40. We now turn to examine whether the State presented sufficient evidence to the jury to establish the statutory elements of section 97-7-10. "When reviewing a case for sufficiency of the evidence, all credible evidence that is consistent with guilt must be accepted as true, and the State is given the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Moore v. State*, 300 So. 3d 1092, 1097 (¶16) (Miss. Ct. App. 2020) (citations and internal quotation marks omitted). In this regard, "[w]e must affirm the conviction if after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation mark omitted). "Matters regarding the weight and credibility of the evidence are to be resolved by the jury." *Pool v. State*, 724 So. 2d 1044, 1046 (¶11) (Miss. Ct. App. 1998). "We are authorized to reverse only where, with

---

review of the trial transcript shows that in response to Walker's motion for a directed verdict at the close of the State's case-in-chief, the State argued at length that viewing the evidence in the light most favorable to the State, it had proved the elements of section 97-7-10 and that there was sufficient evidence to submit the case to the jury. *In the alternative only*, the State moved to amend the indictment pursuant to Mississippi Code Annotated section 99-17-13 (Rev. 2015) to conform the indictment to the proof by substituting "the Circuit Court [C]lerk of Greene County, Mississippi," with "the Mississippi Department of Corrections."

The trial court denied Walker's motion for a directed verdict, agreeing with the State's argument that there was sufficient evidence before the jury to allow the case to proceed. We recognize that the trial court denied the State's motion for *alternative* relief seeking to amend the indictment, expressing concern about the timing of the motion. We find nothing, however, supporting Walker's assertions that the trial court made any determination that this was an essential element of the crime charged. We find that Walker's assertions with respect to this issue are without merit.

18

respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." *Id.*

¶41. Applying this standard of review, we find that the State established with sufficient proof the elements of the crime of making "False Representations to Defraud Government" under section 97-7-10, namely that Walker "knowingly and willfully ma[d]e or use[d]" a fraudulent document; "knowing [it] . . . contain[ed] . . . fraudulent statement[s] or entr[ies]"; with the "intent to defraud [a state governmental entity]."

¶42. We recognize that this is a circumstantial evidence case. In this regard, "[d]irect evidence is unnecessary to support a conviction so long as sufficient circumstantial evidence exists to establish guilt beyond a reasonable doubt." *Underwood v. State*, 708 So. 2d 18, 35 (¶49) (Miss. 1998) (citations and internal quotation marks omitted). "Circumstantial evidence need not exclude every possible doubt, but only every other reasonable hypothesis of innocence." *Neal v. State*, 805 So. 2d 520, 526 (¶20) (Miss. 2002) (citation and internal quotation marks omitted). In *Manyfield v. State*, 296 So. 3d 240, 250-51 (¶36) (Miss. Ct. App. 2020), this Court recognized that "[o]ur system of justice allows the jury to make logical and reasonable inferences and presumptions. . . . From these reasonable inferences, even if jurors could have come to different conclusions on each element of the crime, the evidence remains sufficient." (Citations and internal quotation marks omitted). As addressed below, we find that the jury heard sufficient evidence "to make logical and reasonable inferences," *id.* at 250 (¶36), that Walker was guilty of violating section 97-7-10 in this case.

19

### 1. Fraudulent Order

¶43. First, we find that the jury heard ample evidence that the *Walker* order was fraudulent. The order appeared to be electronically signed by Judge Jackson, but the testimony of both Judge Jackson and Circuit Clerk Cecelia Bounds made clear that Judge Jackson did not use an electronic signature and that she did not sign the *Walker* order. Bounds also testified that there was no case pending in the Greene County Circuit Court captioned *Demario Walker v. Marshall Turner* having the cause number contained on the order.

### 2. "Ma[d]e" the Fraudulent Order with Intent to Defraud

¶44. Second, we find that the jury could reasonably infer that Walker knew the *Walker* order was fraudulent and that he "ma[d]e" it with the intent to defraud. Officers Keys and Woolman testified that they searched Walker on June 16, 2017. They found a cell phone charger hanging between Walker's legs, and when they searched Walker's belongings, they found a cell phone, wrapped in cellophane, inside a coffee cup with coffee in it.

¶45. Chief Investigator Cooksey testified that he used computer software to extract the information from the cell phone to generate a report of the contents. He testified that he reviewed the cell phone contents from the extraction report, and both Cooksey and Woolman testified that information on the report linked Walker to the cell phone, including text messages and email addresses with all or part of Walker's name in them and other documents containing Walker's name. Cooksey and Woolman also both testified that the fraudulent "Order Granting Motion to Provide Records, Granting Motion for Legal Assistance, and

20

Granting Motion for Summary Judgment" (the *Walker* order) was on the cell phone. Investigator Smith also testified at trial and reviewed the extraction report. He testified that he discovered the *Walker* order with Walker's name in the document section of the extraction report.

¶46. Investigator Smith also testified that he linked "at least 120 of the 140 user accounts" listed in the cell phone extraction report to Walker because his name could be found in the username or password, "and in some of . . . the user accounts, his name was actually in the email."[7] One of the email accounts Smith found on the cell phone was court.doc.orders@usa.com, which was the email used to send the fraudulent *Walker* order to Box at MDOC. Additionally, Investigator Smith testified that he discovered searches made on the cell phone that included "faxed from phone free," "fax burner app," "signature app," "seal maker," "edit pdf documents for free," "filing apps," "letterhead maker," "court ordered," "court ordered documents," "fill in the blank documents," "court documents creator," "legal documents template," and "legal pleadings template."

¶47. Walker testified on his own behalf. He admitted that he used the cell phone, but he denied drafting the fraudulent order and he testified that other inmates also used the cell phone. "Conflicts in the evidence are for the jury to resolve." *Pruitt v. State*, 122 So. 3d 806, 809 (¶8) (Miss. Ct. App. 2013) (internal quotation mark omitted). Based upon the applicable

---

[7] Investigator Smith testified that there may have been occasions in which other inmates used the cell phone, but those instances were easily identifiable because the inmates would identify themselves to the text message recipient.

standard of review, we find that the State presented sufficient evidence that Walker "ma[d]e" the fraudulent *Walker* order on the contraband cell phone in this case.

¶48.    We also find that there was sufficient evidence before the jury that it could reasonably infer that Walker intended to defraud the Greene County Circuit Court and Circuit Clerk in "mak[ing]" the *Walker* order.  The order contained the fraudulent electronic signature of Judge Jackson—a senior Greene County Circuit Court judge—and granted specific relief to Walker in Judge Jackson's name.  This relief included ordering Box to provide Walker "with a full and complete copy of his prison record . . . at no cost to [Walker] upon receipt of this order or not less than 14 days."

¶49.    The evidence showed that Walker had an incentive to pursue that relief through the fraudulent order.  Box testified that Walker had requested his prison records through a direct request to MDOC just weeks before the fraudulent *Walker* order was prepared but was unable to expeditiously obtain them through that request.[8]  Even Walker agreed on cross-examination that it was "suspect" that the *Walker* order should appear "not a month later . . . requesting the very same records that [he] would have to jump through additional hoops [at MDOC] to get."  The jury could reasonably infer that by making the *Walker* order, Walker intended to fraudulently manipulate the Greene County Circuit Court system to obtain his prison records by an order issued by a Greene County Senior Circuit Court judge, rather than

---

[8] The State's Exhibit 5 admitted at trial was MDOC's response to Walker's request. MDOC's response informed Walker that Box did not have the records, and he would have to obtain them by separate requests to various other departments.

22

pursue any further requests directly through MDOC.

### 3. "Use[d]" the *Walker* Order with Intent to Defraud

¶50. Finally, we find that sufficient evidence was before the jury to allow it to reasonably infer that Walker knowingly and willfully "use[d]" the fraudulent *Walker* order with the intent to defraud MDOC, and, in turn, the Greene County Circuit Court and Circuit Clerk.

¶51. Box testified that on June 16, 2017, she received an email from the email address "court.docs.orders@usa.com" with an attachment titled "Order Granting Motion to Provide Records, Granting Motion for Legal Assistance, and Granting Motion for Summary Judgment." Bounds testified that on the same day, she received two phone calls from an individual with a 202 area code number that sounded like an inmate calling her from prison. The individual—once posing as Walker's representative and once as an MDOC official—asked whether an order had been filed in Walker's pending case. Bounds testified that the voice of the individual on the 202 area code phone calls sounded like Walker's voice.

¶52. Bounds also testified that later that day, she received a phone call from an MDOC official who requested validation of the order. The MDOC official emailed Bounds a copy of the order because Bounds did not have it in her file. Upon receipt, Bounds immediately knew that the order was fraudulent because Judge Jackson's signature was not valid. We find that this constitutes sufficient evidence to allow the jury to conclude that Walker used the fraudulent *Walker* order with the intent to defraud MDOC.

¶53. Additionally, regarding Walker's intent to defraud the Greene County Circuit Court

23

and Circuit Clerk, the jury heard Walker's testimony that "he represents himself" in lawsuits, and Walker represented himself in this case with the assistance of counsel in various capacities. Based upon this information and Bounds's testimony regarding the 202 area code phone calls, we find that the jury could reasonably infer that Walker knew that before complying with the non-certified *Walker* order, an MDOC official would need to confirm its validity with the Greene County Circuit Court Clerk. The jury could reasonably infer that Walker intended to defraud the Greene County Circuit Court and Circuit Clerk by intending for Bounds to receive the fraudulent *Walker* order and act upon it by verifying its validity for the MDOC.

## II.    Constructive Amendment of Walker's Indictment

¶54.    In a related issue, Walker asserts that the trial court constructively allowed the State to amend the indictment when the trial court denied his motions for a directed verdict, peremptory instruction, and judgment notwithstanding the verdict. Walker asserts that the trial court thereby allowed the jury to consider finding Walker guilty if the jury found that Walker submitted the orders to Alicia Box at MDOC instead of Cecelia Bounds, the Greene County Circuit Court Clerk. To be clear, Walker does not assert that any jury instruction was given that purportedly constructively amended his indictment; he could not do so because Jury Instruction 3 mirrors Walker's indictment. In essence, therefore, Walker contends that the trial court constructively amended his indictment because the proof presented at trial did not match a particular factual statement in his indictment—namely, that he submitted the

fraudulent order to the Greene County Circuit Court Clerk.

¶55. In Section I above, we have already addressed—and rejected—Walker's assertions that the evidence presented to the jury was insufficient to support the verdict against him because the State did not prove the fraudulent order was submitted to Cecelia Bounds (the Greene County Circuit Court Clerk) rather than Alicia Box at MDOC. Walker's assertions here are simply a variation on that same theme and are similarly without merit.

¶56. "'Not every variance between the language of the indictment and the proof is material'" so as to require reversal based upon that variation. *Burrows v. State*, 961 So. 2d 701, 705 (¶11) (Miss. 2007) (quoting *Burks v. State*, 770 So. 2d 960, 963 (¶13) (Miss. 2000)); *see also Graham v. State*, 185 So. 3d 992, 1001 (¶25) (Miss. 2016). Rather, "[t]he central question is whether the variance is such as to substantially alter the elements of proof necessary for a conviction." *Bell v. State*, 725 So. 2d 836, 855 (¶61) (Miss. 1998). As we have already addressed above, the variance in proof from the indictment regarding the particular governmental entity receiving the fraudulent order is not an essential element of "False Representations to Defraud Government" under section 97-7-10. Accordingly, we find that there was no material variation to warrant reversal in this case.

¶57. Walker also asserts that reversal is required because the indictment failed to put him on notice of what he had to defend against. We find that this additional contention also fails. "The primary purpose of an indictment is to provide the defendant with a concise statement of the crime so that he may have a reasonable opportunity to prepare and present a defense

to those charges." *Burrows*, 961 So. 2d at 705 (¶¶11-14). In this regard, "[a]n indictment that contains the essential elements of the charges against the defendant sufficiently places the defendant on notice of the nature of the charges against him." *Graham*, 185 So. 3d at 999 (¶20).

¶58. Walker's indictment plainly put him on notice that he was charged with violating section 97-7-10 ("False Representations to Defraud Government"). The indictment contained the essential elements of that crime, and the factual allegation that the fraudulent order was submitted to the Greene County Circuit Court Clerk was not a necessary or essential element of the charge. *Rickie Smith*, 250 So. 3d at 427-29 (¶¶22-29); *Rashad Smith*, 275 So. 3d at 107 (¶20).

¶59. Further, although Walker chose to emphasize in closing that he did not submit the fraudulent order to the Greene County Circuit Court Clerk, the record clearly reflects that the variance between the indictment and the proof did not materially affect Walker's overall defense that he did not commit the crime charged at all. Specifically, Walker denied making or using the fraudulent order in any way:

> COUNSEL: Did you draft [that] order[]?
>
> WALKER: I did not.
>
> COUNSEL: Did you transmit [that] order[] to anyone?
>
> WALKER: I did not.
>
> COUNSEL: Did you ask anyone to transmit [that] order[] anywhere for you?

26

WALKER:    I did not.

COUNSEL:   Did you have any knowledge of [that] order[] prior to [it] being
           transmitted?

WALKER:    I did not.

This assignment of error is without merit.

### III.    Admission into Evidence of Other Crimes or Bad Acts

¶60.    Walker asserts that the trial court erred in allowing the State to elicit testimony regarding his use of the cell phone to conduct illegal activities.  He asserts, in particular, that he was prejudiced by the admission into evidence of a "statement made to the jury [by the prosecution] that . . . Walker was using the [cell] phone to 'scam' multiple other people." The State asserts that Walker "opened the door" to questioning relating to Walker's use of the cell phone and certain email accounts under "fake names" and filing "fraudulent tax returns" when Walker questioned Investigator Smith about these emails in attempting to show that other inmates used the phone.  Thus, the State asserts, the trial court did not abuse its discretion in allowing the State to continue this line of questioning on cross-examination about these emails to link them to Walker. We agree for the reasons discussed below.

¶61.    "We review the admission or exclusion of evidence under an abuse-of-discretion standard." *Pustay v. State*, 221 So. 3d 320, 345 (¶68) (Miss. Ct. App. 2016).  "Furthermore, 'a trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling.'" *Id.* (quoting *Hargett v. State*, 62 So. 3d 950, 952-53 (¶7)

27

(Miss. 2011)). Applying this standard, we find that the trial court did not abuse its discretion in allowing the State to question Walker about these emails under the circumstances in this case.

¶62. Mississippi Rule of Evidence 404(b)(1) generally provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, "[i]t is well-settled that a defendant who 'opens the door' to a particular issue runs the risk that collateral, irrelevant, or otherwise damaging evidence may come in on cross-examination." *Martin v. State*, 970 So. 2d 723, 725 (¶11) (Miss. 2007) (quoting *Murphy v. State*, 453 So. 2d 1290, 1294 (Miss. 1984)).

¶63. In this case, Walker questioned Investigator Smith about particular emails on the cell phone extraction report, the first being an email addressed to "Michael" about an error in a tax return. Walker stated, "So somebody named Michael filed income tax, all right." Investigator Smith responded, "Either that or somebody filed a tax return under the name of Michael." Walker next questioned Investigator Smith about another email addressed to Kendrick Crockett and sent to the email address taxtax006@gmail.com. Investigator Smith testified that the password for the email account was the same password used for other accounts linked to Walker, including WT Consulting. Walker also questioned Investigator Smith about another email to "Michael" at the taxtax006@gmail.com email address about an error in a tax return.

¶64.   Before Walker could continue questioning Investigator Smith about more emails with different names, the State requested a bench conference.  In that conference, the State told the trial court that Walker's line of questioning was "touching on some testimony that [Walker] has been scamming people."  The trial court said "that that would be ripe for cross-examination," and Walker's counsel stated that "[he had] advised [Walker]" of the potential consequences of the line of questioning Walker was pursuing.  Walker then resumed questioning Investigator Smith about phone calls and text messages found on the cell phone that were possibly made or sent by other inmates.

¶65.   On cross-examination, the State questioned Investigator Smith about the taxtax006@gmail.com emails:

THE STATE:      I want to talk to you about this tax file email . . . .  Was it your testimony that you were able to relate that email address back to the phone?

INVESTIGATOR
SMITH:          Correct.

THE STATE:      With the password, I believe it was . . . .

INVESTIGATOR
SMITH:          [password given]

THE STATE:      There were a lot of different names mentioned in the exhibit in front of you regarding those tax files. Through your review of the phone and your knowledge of this case, are you able to relate that the defendant was using that email address to maybe conduct some improper means . . . .

WALKER:         Objection, Your Honor.

29

| | |
|---|---|
| THE STATE: | He opened the door. |
| THE COURT: | You did. |
| INVESTIGATOR SMITH: | Yes. |
| THE STATE: | I may not be asking the question properly but do you have evidence in your review of the extraction [report] that it was the defendant who was using that email address to obtain information or money by illegal means? |
| INVESTIGATOR SMITH: | Yes. |
| THE STATE: | In fact, there's a text message regarding that, all I do is scam Monday through Friday, 8 to 5 online. |
| INVESTIGATOR SMITH: | Correct. |
| THE STATE: | I'd like to—if you don't recall it, I'd like to show it to you, the date and time of that text message. I'll refer to you Item No. 535. If you can, tell the members of the jury when that text was sent, all I do is scam. |
| WALKER: | Your Honor, I object to that. That document is not in evidence. It has not been marked for identification purposes. |

¶66. In arguing the basis of his objection outside the presence of the jury, Walker contended that by referencing this text, "[t]he State is trying to relate to the jury that hey, [Walker] was using this phone to commit other . . . bad acts, other crimes illegally." The trial court sustained Walker's objection and told the prosecutor that "[i]f you have questions that would link or identify Michael and connect it to Mr. Walker, you can ask that question[,] . . .

[but] I don't want to go any further and I sustain the objection." The jury was called back into the courtroom, and the trial court informed the jury that Walker's objection had been sustained.

¶67. Based upon our review of the record, we find that the use of the taxtax006@gmail.com email address and whom it may have belonged to was initiated by Walker in attempting to show there was no link between him and this account. And according to Walker's counsel, Walker pursued such line of questioning even after he was warned that this could lead to further questioning by the State concerning underlying circumstances surrounding the emails. We find that the trial court did not abuse its discretion in allowing the State to continue the line of questioning about the email account in attempting to identify "Michael" or "Kendrick Crockett" and link the improper use of that account to Walker. *See Martin*, 970 So. 2d at 726 (¶12) (Where the defense initiated questioning about a youth court adjudication concerning abuse victims, there was no error in allowing the State to continue this line of questioning.).

¶68. It is also relevant that Walker relies primarily on the State's reference to the "scam" text message as the basis for his assertion that Investigator Smith's reference to *its* contents impermissibly prejudiced his case. The trial court, however, *sustained* Walker's objection relating to this text message and informed the jury that the objection had been sustained. Walker did not seek a mistrial or request a limiting instruction regarding the State's reference to it.

31

¶69. We find the *Martin* decision instructive on this issue. In that case, the defendant contended that he was prejudiced when the prosecutor questioned a witness about his prior DUI accident in which someone was nearly killed. *Martin*, 970 So. 2d at 726 (¶13). Although the supreme court found that this line of questioning was "inappropriate," it found no basis for error where "the trial court sustained the defense's objection to this line of questioning, and defense counsel neither requested a limiting instruction, nor moved for a mistrial." *Id.* at (¶15). The supreme court recognized that "[w]e consistently have held that issues not presented to the trial court are deemed waived and may not be raised for the first time upon appeal." *Id.* Continuing, the supreme court held that "[i]t is not per se prejudicial for a jury to hear an isolated instance of a crime or bad act during the course of a trial. . . . Thus, the burden is properly on defense counsel to seek a mistrial or ask for a limiting instruction." *Id.* at (¶16). We apply the same analysis here. The trial court ultimately sustained Walker's objections to the "scam" text, but Walker failed to seek a limiting instruction or move for a mistrial. We find no error in the trial court's handling of this issue. This assignment of error is without merit.

IV. **Denial of Walker's Motions to Dismiss and Suppress Evidence Found on the Contraband Cell Phone in Walker's Possession**

¶70. Walker filed a motion to dismiss and several motions to suppress evidence that were based on the warrantless search of the contents of the cell phone that Officers Keys and Woolman testified they discovered among Walker's belongings. Walker asserts that the trial

32

court erred in denying these motions.[9]  We find this assignment of error is without merit.

¶71.    We recognize that "both the United States Constitution and the Mississippi Constitution [protect individuals] from unreasonable searches and seizures."  *Galloway v. State*, 122 So. 3d 614, 669 (¶182) (Miss. 2013) (citing U.S. Const. amend. IV; Miss. Const. art. 3, § 23).  Particularly relevant to our analysis in this case, however, is that "the accepted law of search and seizure holds that one may only challenge an intrusion where one would objectively and reasonably expect privacy."  *Pierre v. State*, 607 So. 2d 43, 52 (Miss. 1992) (quoting *Katz v. United States*, 389 U.S. 347, 351-52 (1967)).

¶72.    In this regard, the United States Supreme Court and the Mississippi Supreme Court have recognized that a prisoner has no "legitimate . . . subjective expectation of privacy . . . in his prison cell," *Hudson v. Palmer*, 468 U.S. 517, 526 (1984), and thus "the Fourth Amendment proscription against unreasonable searches does not apply" in that context.  *Id*.; *see also Robinson v. State*, 312 So. 2d 15, 18 (Miss. 1975) ("It is well settled that the prison authorities may subject an inmate to intense surveillance and search unimpeded by the Fourth Amendment barriers[;]" and "[i]t is likewise certain that a prison cell is not a place where the occupant can expect privacy or a place where he can expect to be free from search and seizure unless accompanied by a warrant.").

¶73.    Regarding Walker's specific assertion that the warrantless search of the contraband cell phone violated his Fourth Amendment rights, we recognize that the United States

---

[9] Walker does not assert on appeal that the cell phone itself was illegally obtained.

Supreme Court has held that a warrant is required before an officer may lawfully search the information on a cell phone seized incident to an arrest. *Riley v. California*, 573 U.S. 373, 401 (2014). The Supreme Court also recognized, however, that "case-specific exceptions may still justify a warrantless search of a particular phone." *Id.* at 401-02. We find that such a "case-specific exception[]" exists in instant case. *Riley* concerned the privacy interests of an arrestee in his cell phone—not Walker's much more limited privacy interest as a prison inmate in the contraband cell phone and its contents at issue here. *See Hudson*, 468 U.S. at 526; *Robinson*, 312 So. 2d at 18. This distinguishing factor is a "case-specific exception[]" to *Riley* in the instant case.

¶74. Although we find no Mississippi cases specifically addressing an inmate's privacy interest in the contents of a cell phone in his possession, other courts have found no expectation of privacy in analogous circumstances. We look to these decisions for guidance. In *United States v. Jackson*, 866 F.3d 982 (8th Cir. 2017), for example, Jackson was serving a term of supervised release and resided in a correctional facility. *Id.* at 983. Supervised releasees were banned from possessing cell phones in the facility. *Id.* at 985. Jackson had a cell phone at the facility, and after one warning, the cell phone was confiscated the second time it was found, and it was searched without a warrant, and information found on Jackson's cell phone was used to support a child-pornography charge against Jackson. *Id.* at 984. Jackson moved to suppress the information found on his cell phone, asserting the information was obtained in violation of his Fourth Amendment rights. *Id.*

34

¶75. The Eighth Circuit Court of Appeals affirmed the denial of the motion to suppress the evidence, finding no Fourth Amendment violation had occurred. *Id.* The court concluded that "[g]iven Jackson's diminished expectation of privacy as a supervised releasee" as compared to the arrestee in *Riley*, *id.* at 985, and that Jackson was on "clear notice" that he must follow the rules of the correctional facility, "Jackson did not enjoy an expectation of privacy in his cell phone that society would recognize as legitimate." *Id.* The court also recognized that "the government's action here [in searching the contraband cell phone] also furthered substantial interests in preventing recidivism and facilitating an offender's reentry into the community." *Id.*; *see United States v. Johnson*, 875 F.3d 1265, 1275-76 (9th Cir. 2017) (recognizing that "a parolee had no expectation of privacy in [his] cell phone contents" and therefore "a search of the cell phone did not violate his fourth Amendment rights"); *see also United States v. Hathorn*, 920 F.3d 982, 987 (5th Cir. 2019) (recognizing that an exception to *Riley* included a condition of defendant's supervised release allowing a warrantless search of his cell phone upon reasonable suspicion).

¶76. In this case, Walker is incarcerated—his status as a prison inmate holds the most limited privacy rights, which are even more circumscribed than those of a parolee or an offender on suspended release, like the defendants in the cases discussed above. *See, e.g.*, *Johnson*, 875 F.3d at 1275 (recognizing that "on the continuum of state-imposed punishments, parolees appear to hold the most limited privacy interests among people convicted of a crime but are not actually imprisoned" (citations and internal quotation marks

35

omitted)). Further, the possession of a cell phone by an inmate is unlawful, Miss. Code Ann. § 47-5-193 (Rev. 2015), thus further diminishing Walker's expectation of privacy in the contraband cell phone's contents. *See Jackson*, 866 F.3d at 985. Under these circumstances, we find that Walker had no legitimate privacy interest in the contents of the contraband cell phone and that the government had a substantial interest in enforcing its rules and the laws of the State of Mississippi. *Id.* As such, we find that the warrantless search of the contraband cell phone did not violate Walker's rights under the Fourth Amendment or Article III, Section 23 of the Mississippi Constitution, and the trial court did not err in denying Walker's motion to dismiss and motions to suppress the contents of the cell phone. This assignment of error is without merit.

### V. Right to Counsel and Self-representation

### A. Knowing and Voluntary Waiver of Right to Counsel

¶77. Walker asserts that the trial court erred by allowing him to represent himself during pretrial and trial proceedings. He claims that the trial court failed to assess his competency to do so and failed to obtain a knowing and voluntary waiver from him of his right to counsel in violation of the Sixth Amendment to the United States Constitution. *See* U.S. Const. amend. VI; *Bradley v. State*, 58 So. 3d 1166, 1167 (¶5) (Miss. 2011). The "Court's standard of review on such constitutional issues is de novo." *Hearn v. State*, 3 So. 3d 722, 732 (¶25) (Miss. 2008).

¶78. The Sixth Amendment provides that "a criminal defendant has the right to represent

36

himself only if he knowingly and intelligently chooses to do so." *Id*. "In order for a defendant to knowingly and intelligently waive the right to counsel, the defendant must meet a test for competency to stand trial." *Edwards v. State*, 800 So. 2d 454, 466 (¶33) (Miss. 2001). In this regard, "[t]he standard for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and 'has a rational as well as factual understanding of the proceedings against him.'" *Martin v. State*, 871 So. 2d 693, 697-98 (¶16) (Miss. 2004) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

¶79. Additionally, Mississippi Rule of Criminal Procedure 7.1(c) outlines the process the trial court is to undertake to "determin[e] if the defendant knowingly and voluntarily desires to act as his/her own attorney." MRCrP 7.1(c). Rule 7.1(c) provides:

> Waiver of Right to Counsel. When the court learns that a defendant desires to act as his/her own attorney, the court shall conduct an on-the-record examination of the defendant to determine if the defendant knowingly and voluntarily desires to act as his/her own attorney. The court shall inform the defendant that
>
> 1. The defendant has a right to an attorney, and if the defendant cannot afford an attorney, then the court will appoint one free of charge to defend or assist the defendant in his/her defense.
>
> 2. The defendant has the right to conduct the defense and may elect to do so and allow whatever role (s)he desires to his/her attorney.
>
> 3. The court will not relax or disregard the rules of evidence, procedure or courtroom protocol for the defendant and that the defendant will be bound by and have to conduct himself/herself within the same rules as an attorney, that these rules are not simple and that without legal advice his/her ability to defend himself/herself will be hampered.

4. The right to proceed pro se usually increases the likelihood of a trial outcome unfavorable to the defendant.

5. Other matters as the court deems appropriate.

Rule 7.1(c) then provides that "[a]fter informing the defendant and ascertaining that the defendant understands these matters," then "the court will . . . ascertain whether the defendant still wishes to proceed pro se or if the defendant desires an attorney to assist him . . . in his . . . defense." The rule delineates the procedure the trial court should undertake "[i]f the defendant desires to proceed pro se," as follows:

> [T]he court should determine whether the defendant has exercised this right knowingly and voluntarily and, if so, make the finding a matter of record. At the time of accepting a defendant's waiver of the right to counsel, the court shall inform the defendant that the waiver may be withdrawn and counsel appointed or retained at any stage of the proceedings. Additionally the court may appoint an attorney to assist the defendant on procedure and protocol, even if the defendant does not desire an attorney. Such advisory counsel shall be given notice of all matters of which the defendant is notified.

MRCrP 7.1(c).

¶80. In November 2018, Walker moved pro se to have his court-appointed public defender replaced because that counsel purportedly refused to cooperate with his requests or effectively communicate with him. Effective January 14, 2019, the trial court granted Walker's request and appointed Christopher Dobbins to defend and represent Walker. Five months later, Walker moved pro se for the trial court to allow Dobbins to withdraw and to appoint new counsel, alleging that he (Walker) did not believe that Dobbins was acting in Walker's best interest. A week later, Walker moved pro se to represent himself and conduct

38

his own defense.

¶81. At an August 2019 hearing on Walker's pro se motions, Dobbins explained to the trial court that his understanding after speaking with Walker was that Walker wished to represent himself but that Dobbins would stay on as "advisory" or "standby" counsel for him. Walker confirmed this was his desire. The trial court initially told Walker:

> Quite frankly, in my interactions with you [I] haven't noticed anything other than your persistent insistence on filing motions and representing yourself and wanting to have a voice in your own defense, other than that that would indicate to me that you're suffering from some type of mental instability that would prohibit you from making rational decisions and being able to cooperate with your attorney.

After making this observation, however, the trial court specifically asked Walker about another pro se motion Walker had filed seeking a mental evaluation. The trial court asked Walker whether he still wanted to move forward on that motion, explaining, "I ask that question because before I can allow you to represent yourself, I have to make a determination that you fully understand the consequences of doing so."

¶82. Walker told the trial court that the motion for a mental evaluation was intended to be with respect to his mental state at the time he committed the alleged crime, not "his mental health at the time of trial." Nevertheless, after questioning Walker further and learning that Walker was "tak[ing] a couple of different antipsychotic medications, as well as meet[ing] with mental health counselors twice a month," the trial court ended the hearing. The trial court then issued an order for Walker to be mentally evaluated to determine whether he was competent to stand trial and what his mental state was when the crime was committed.

39

¶83. The psychiatric evaluation was conducted and filed under seal. At a September 2019 competency hearing, Walker agreed to stipulate to the findings in the psychiatric report. Those findings were read into the record by the trial court:

> It's [the doctor's] conclusion that you do have the present ability to proceed and understand the nature of these proceedings, that you have an ability to communicate rationally with your attorney about the case and that you have a rational ability to recall facts and testify in your own defense if you wish to do that. That is the standard . . . by which competency is determined and as a result of that, I find you are competent to stand trial.

¶84. The trial court did not rely solely on the mental evaluation in determining Walker's competency to represent himself and knowingly and voluntarily waive his right to counsel. In addition to the mental evaluation, the trial court also questioned Walker on several issues in conformance with Rule 7.1(c). The trial court began by ascertaining the nature of Walker's education, learning that Walker had earned two degrees: one in business from Jackson State University and one in social work from Howard University. Walker also informed the trial court that he had held jobs at a consulting firm, the Mississippi Department of Human Services, and various stores in managerial positions.

¶85. The trial court also asked Walker about his mental-health history. Walker told the court that he had been involuntarily committed when he was a teenager, and he was currently being treated for manic bipolar depression and paranoid schizophrenia (diagnosed about ten years earlier) and for anxiety. The trial court ascertained that Walker was diagnosed with these disorders and was still able to graduate from two colleges.

¶86. The trial court then asked Walker about his familiarity with the legal system. Walker

40

said that he had represented himself "up until a plea" in criminal court, but not at trial, and

that he had represented himself through trial in "about six" civil actions in federal court.

Walker said he had represented himself in "I think it's like, 140 something" civil cases.

Walker acknowledged that he had a copy of the Mississippi Rules of Criminal Procedure and

was familiar with them and the Mississippi Rules of Evidence.

¶87.   Following this questioning, the trial court specifically told Walker about the danger

in representing himself; the diminished likelihood of success if he were to do so; and the trial

court's inability to assist Walker or relax any rules or procedures in any way.  The trial court

also carefully questioned Walker about the insanity contentions that underscored his request

for a mental evaluation.  Walker again assured the trial court that these contentions concerned

his mental state at the time of the crime, not regarding his competency to represent himself

during trial:

> THE COURT:      Even though you sit there and maintain that you were
> insane at the time of the commission of the offense, you
> believe that you are competent to represent yourself in a
> court of law?
>
> WALKER:         . . . So I wasn't contending at this particular point in time
> that I would be incompetent to stand trial, but at the time
> of the crime I believe that my sanity was and still is an
> issue at the time of the crime.

The trial court then specifically asked Walker, "Is it still your desire to represent yourself?"

Walker responded, "Yes, sir."  Walker then requested that Dobbins remain as standby

counsel because they were now "getting along better."  The trial court allowed Walker to

41

represent himself with Dobbins to remain as standby counsel.

¶88.    Based upon our review of the record, we find that the trial judge was plainly aware of the applicable law and Rule 7.1 and properly applied both. *See Bradley*, 58 So. 3d at 1168 (¶7).   In particular, Walker knew that he had a right to counsel (MRCrP 7.1(c)(1)):  he was already represented by Dobbins when he moved pro se to represent himself.   Walker also knew he could "allow whatever role [h]e desire[d] to his . . . attorney" (MRCrP 7.1(c)(2)): Walker specifically asked the trial court to allow Dobbins to remain as standby counsel. Regarding the remaining factors, the transcript of the competency hearing clearly reflects that the trial court ensured that Walker was familiar with the legal system and the applicable rules; and the trial court specifically warned Walker that he would receive no help whatsoever from the trial court in representing himself at any stage of the proceedings. *See* MRCrP 7.1(c)(3).   The trial court also expressly warned Walker of the dangers of representing himself, and Walker acknowledged that danger.  MRCrP 7.1(c)(4).  The trial court then explicitly ascertained, on the record, that Walker wanted to represent himself, and the trial court appointed Dobbins as standby or advisory counsel as Walker requested. *See* MRCrP 7.1(c).  Both the trial court and Dobbins also expressly informed Walker that counsel could resume representing him "at any time upon [Walker's] request." *Id.*  We find that the record "unequivocally reveal[s] that the [trial] court abided by our law and the requirements of [Rule 7.1 and that Walker] . . . made a knowing[,] . . . intelligent[, and voluntary] waiver of his Sixth Amendment right to assistance of counsel." *Bradley*, 58 So. 3d at 1170 (¶10).

## B. Walker's Alleged "Forced" Representation of Himself and Dobbins' Service as Hybrid Counsel

¶89.    Walker also asserts that he was "forced" to represent himself or be faced with Dobbins representing him, who Walker claims "had not [been] representing [Walker's] best interest in [the] case."[10]    We find this contention is entirely without merit.    Not only did Walker assure the trial court at his September 2019 competency hearing that he and Dobbins "get[] along better" and that a "standby" arrangement would work for them, but less than two weeks before the February 2020 trial, Walker notified the trial court that he would be allowing Dobbins to conduct his defense.    Dobbins thereafter served as Walker's "hybrid" counsel throughout trial.

¶90.    To briefly summarize the proceedings relating to this issue, the record reflects that Walker's letter to the trial court provided, "I will be allowing Mr. Dobbins to conduct the defense of this case, as you stated that you'd allow Mr. Dobbins to be counsel at any time I decided not to represent myself."    Before trial began, the trial court sought clarification from Walker about his letter:

> THE COURT:    Mr. Walker, I received a letter from you indicating that you are withdrawing your request to represent yourself. I just need clarification and see to the extent what we're dealing with.
>
> WALKER:    Me and Mr. Dobbins is going to handle different parts of

----

[10] Walker repeatedly asserts in his pro se appellate brief that Dobbins did not effectively represent him, but he does not assert an ineffective-assistance-of-counsel claim in this direct appeal.

43

>
> | | |
> |---|---|
> | | the trial. |
> | THE COURT: | Oh, okay. |
> | WALKER: | We agreed to certain parts of the trial, he's going to do certain parts and I was going to do the other parts. |
> | THE COURT: | All right. Well, all right. That's certainly your right. |

¶91.    We find no evidence that Walkers was "forced" into representing himself pretrial or into participating in his defense at trial.  As we detailed above, we find that Walker made a knowing, intelligent, and voluntary waiver of his constitutional right to assistance of counsel at the September 2019 competency hearing.

¶92.    Further, with respect to the trial itself, we find that although Walker did not completely refrain from participating in his defense, the record reflects that Dobbins served as "hybrid" counsel to Walker at trial.  As such, whether Walker properly waived counsel became moot at that point.  *Hearn*, 3 So. 3d at 734-36 (¶¶29-33); *Hillie v. State*, 313 So. 3d 511, 517-18 (¶¶12-15) (Miss. Ct. App. 2021).

¶93.    In *Hearn*, the supreme court held that it need not determine whether the defendant "properly waived counsel or was adequately warned about proceeding pro se because he was never left to his own defense —[his counsel] functionally remained counsel throughout trial in the form of 'hybrid representation.'"  *Hearn*, 3 So. 3d at 734 (¶29) (citing *Metcalf v. State*, 629 So. 2d 558, 564 (Miss.1993)).  We reach the same conclusion here.  As explained in *Metcalf*, 629 So. 2d at 562-63, hybrid representation is "the participation by an attorney in the conduct of the trial when the defendant is proceeding pro se," and is assessed by using

a number of factors. These factors include "the magnitude of the role [the defendant] desires to assume; whether the trial court encourages immediate and constant accessibility of counsel; and the nature and extent of assistance of counsel which has been provided up to the point of the request, including both substantive and procedural aid." *Hearn*, 3 So. 3d at 734 (¶29) (quoting *Metcalf*, 629 So. 2d at 565).

¶94. The supreme court in *Hearn* found that the defendant had hybrid representation where an attorney (Duggan) "was present at Hearn's counsel table during the entire trial and Hearn consulted with him on several occasions," *id.* at (¶30), and "Hearn conferred with Duggan during the cross-examination of three witnesses and before he chose to testify in his own defense." *Id.* Duggan also provided Hearn with pretrial assistance by filing motions and representing Hearn at a pretrial hearing, *id.*, and the trial court judge "encouraged the constant accessibility of counsel, and advised Hearn to heed Duggan's advice." *Id.*

¶95. We find analogous circumstances exist in this case. Walker and Dobbins responded to questions from the trial court and asserted arguments on behalf of the defense at pretrial-motion hearings. At trial, Walker and Dobbins equally shared responsibility in Walker's defense. Dobbins conducted cross-examination and direct examination of witnesses (including Walker's examination when he testified on his own behalf) and drafted and submitted jury instructions on Walker's behalf. Walker conducted voir dire, the opening statement, cross-examination, and direct examination of witnesses, and Walker and Dobbins split the time for closing argument. Dobbins remained with Walker during trial and was

45

readily available to advise Walker, including advising him before taking the stand to testify on his behalf. In his pro se appellate brief, Walker acknowledges that "Dobbins was available for advice and consultation." In short, Walker's contention that he was "forced" to represent himself or have Dobbins represent him is wholly without merit.

### C. Counsel Prior to Indictment

¶96. Walker also asserts that he was denied his right to counsel "prior to indictment." We recognize that "'under both the United States and the Mississippi constitutions, an accused is entitled to be assisted by counsel during criminal proceedings against him.'" *Howell v. State*, 163 So. 3d 240, 254 (¶35) (Miss. 2014) (quoting *Weeks v. State*, 804 So. 2d 980, 995 (¶54) (Miss. 2001)). The supreme court explained in *Weeks* that "[t]he only difference between the two is the time of attachment . . . . In Mississippi the Sixth Amendment right attaches at the 'accusatory stage.'" *Weeks*, 804 So. 2d at 995 (¶54) (citations omitted). Importantly, the supreme court also recognized that with respect to the right to counsel at the "accusatory stage," the "defendant must be able to show some adverse effect or prejudice to his ability to conduct his defense before denial of this right to counsel constitutes reversible error." *Id.* Under this precedent, we find no merit in Walker's assertion of a right "right to pre-indictment counsel" in this case.

¶97. Walker contends he was entitled to counsel "prior to his indictment," but in *Howell*, the supreme court specifically recognized that "[t]he Sixth Amendment right to counsel is 'offense' specific and does not attach until prosecution begins." *Howell*, 163 So. 3d at 253

(¶33) (quoting *Weeks*, 804 So. 2d at 995 (¶55)). "Thus, the Sixth Amendment right to counsel attaches once the government has initiated charges 'with respect to a particular alleged crime.'" *Id.* (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 177-78 (1991)).

¶98. The record reflects that Walker's indictment and notice of his arraignment scheduled for June 21, 2018, were filed on May 23, 2018; capias was issued that same date. An "Order of Transport" was entered on June 4, 2018, notifying MDOC that Walker was to be transported to the Greene County Courthouse for his June 21, 2018 arraignment. The criminal proceedings against Walker for violation of section 97-7-10 did not even "commence" until the indictment was filed. *See* MRCrP 2.1 ("All criminal proceedings shall be commenced either by charging affidavit, indictment, or bill of information."). We find no basis under these circumstances to support Walker's contention that he was entitled to counsel prior to the filing of his indictment. *See Howell*, 163 So. 3d at 254-57 (¶¶37-41) (finding that defendant had no right to counsel at pre-indictment lineup).

¶99. Further, the record reflects that Walker had taken action to hire his own counsel prior to his first court appearance, as he told the trial court at the June 21, 2018 arraignment:

> THE COURT: Okay. Demario Walker, please. Hello, Mr. Walker. I understand you intend to hire counsel?
>
> WALKER: Yes, sir.
>
> THE COURT: Can you advise me or tell me what the progress is or has been on that front?
>
> WALKER: I talked to Mr. Elliot Burch in jail about two hours ago. He's trying to contact my parents for payment, but I've

47

|  |  | already signed the retainer with him. He's just waiting on them to give it to him. |
|---|---|---|
| THE COURT: |  | Well, then I will continue this until Monday, August 13th. |

¶100. At his rescheduled arraignment, Walker again advised the trial court that he was trying to retain a particular lawyer for his defense, he had talked to the attorney that morning, and he would also be meeting with him that afternoon. Walker also advised the trial court that the attorney told Walker to have the trial court appoint a public defender in the meantime until a first payment on the attorney's retainer fee was paid, advising that it would "be easier that way." The trial court appointed a public defender, who was not present in the courtroom that day, set the case for a status conference to be held six days later, and Walker was arraigned. He pleaded not guilty. The trial court instructed Walker that he must be at the status conference with an attorney, or the public defender would be representing him. The court explained that any motions Walker and his attorney had would be heard at that time.

¶101. Under these circumstances, we find no reversible error in Walker's arraigning taking place without Walker's appointed public defender present because Walker offers no meaningful argument demonstrating that he was "adverse[ly] affected" or "prejudice[d]" in that proceeding. The issue is therefore barred. *Brown v. State*, 690 So. 2d 276, 297 (Miss. 1996) (explaining that the court will not consider on appeal "assignments of error . . . unsupported by any meaningful argument or relevant authority").

¶102. Even if we were to consider this particular issue on the merits, the supreme court

48

found in *Williamson v. State*, 512 So. 2d 868, 875-76 (Miss. 1987), *overruled on other grounds by Hansen v. State*, 592 So. 2d 114 (Miss. 1991), that no reversible error occurred where the defendant was arraigned without counsel. The supreme court recognized that "[t]he arraignment . . . simply serves to inform the accused as to what charges are pending against him. The indictment is read and the accused enters a plea. Even if the defendant pleads guilty, this plea may later be withdrawn and will be inadmissible at a subsequent trial on those charges." *Id.* We find the same logic applies here. This issue is without merit.

¶103. In sum, Walker knowingly, intelligently, and voluntarily waived his right to counsel at the September 2019 competency hearing, and still had the benefit of Dobbins's input as standby counsel. During trial, the record reflects that Dobbins served as "hybrid" counsel, and thus whether Walker "knowingly and voluntarily waived counsel" from that point forward is moot. Regarding Walker's contention that he was wrongly denied counsel "prior to his indictment," this contention is procedurally barred and without merit for the reasons stated. This assignment of error, in toto, is without merit.

## VI. The Testimony of Judge Jackson

¶104. Judge Jackson testified at trial that she did not use an electronic signature and that it was not her signature on the fraudulent *Walker* order at issue in this case. Walker asserts that the trial court erred when it allowed Judge Jackson to testify because she was not disclosed on the State's witness list before trial. We find this contention without merit.

¶105. "'In reviewing rulings of a trial court regarding matters of evidence, relevancy and

discovery violations, the standard of review is abuse of discretion.'" *Edwards v. State*, 162 So. 3d 864, 866 (¶7) (Miss. Ct. App. 2014) (quoting *Montgomery v. State*, 891 So. 2d 179, 182 (¶6) (Miss. 2004)).

¶106. Rule 17.2 of the Mississippi Rules of Criminal Procedure requires the State to disclose to the defense the identity of all witnesses it proposes to offer at trial, together with any statement made by that witness and the substance of the witness's oral testimony. *See* MRCrP 17.2. Rule 17.9 sets forth the applicable procedure that applies if a witness is not timely disclosed:

> If, during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these Rules and the defense objects to the introduction for that reason, the court shall . . . [g]rant the defense a reasonable opportunity to interview the newly discovered witness . . . ."

MRCrP 17.9(b)(1). Afterward, if the defense still claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the trial court has three options: (1) exclude the evidence, (2) grant a continuance, or (3) order a mistrial. MRCrP 17.9(b)(2).

¶107. The record reflects that in November 2019 (two and one-half months before the February 2020 trial), the State requested that Walker stipulate to Judge Jackson's testimony. According to Walker, he did not do so "because it's an element of the crime that they would have to prove." At trial, the State called Judge Jackson as its second witness without objection. The State proceeded with its direct examination of Judge Jackson, and she provided the testimony described above.

50

¶108. Walker objected near the end of Judge Jackson's direct-examination testimony because he "just noticed . . . [that] [t]he State [failed] to give the defense notice on their witness list that they would be calling Ms. Kathy King Jackson." The Court sought clarification regarding Walker's objection:

THE COURT: It's my understanding that [the State] requested that you stipulate to [Judge Jackson's] testimony and you refused and that's why she's testifying here today.

WALKER: I believe in November [the State] did ask me to stipulate and I said no but . . . [w]hen I said I would not stipulate, [the State] didn't advise me whether [the State] was still going to call Ms. Jackson or not. But [the State] never updated [its] witness list as required by the rules for the defense to have notice of [its] witnesses.

THE COURT: Your objection is noted and it'll be overruled.

¶109. We find that Walker's assignment of error on this issue is procedurally barred because his objection to Judge Jackson's testifying was untimely. Rule 17.9(b) requires that "the defense object[] to the *introduction* [of the evidence]." (Emphasis added). In this case, Judge Jackson was called ("introduc[ed]") as a witness without objection, although Walker had known the substance of her testimony since November 2019 when the State asked for him to stipulate to that testimony. Walker then allowed the State to nearly complete its direct examination of Judge Jackson before he objected. We find no abuse of discretion in the trial court's overruling Walker's untimely objection. This issue is therefore waived on appeal. *Smith v. State*, 797 So. 2d 854, 856 (¶7) (Miss. 2001) ("It is axiomatic that a litigant is required to make a timely objection. We have repeatedly held that if no contemporaneous

51

objection is made, the error, if any, is waived.").

¶110. Procedural bar aside, we also find that Walker's contentions are without merit because any purported error was harmless. "A violation of [URCCC] 9.04 [(the predecessor to MRCrP 17.9)] is considered harmless error unless it affirmatively appears from the entire record that the violation caused a miscarriage of justice." *Payton v. State*, 897 So. 2d 921, 942 (¶67) (Miss. 2003). In *Payton*, the supreme court found that the trial court's denial of a continuance based upon undisclosed testimony constituted "harmless error," if anything, where the defendant knew the substance of the witness's testimony, the new additional testimony concerned "trivial matters," and even without the testimony the defendant could have been convicted because the other evidence against him "adequately supported the verdict." 897 So. 2d at 942 (¶68).

¶111. Similar circumstances exist here. Indeed, Walker's notice of the substance of Judge Jackson's testimony essentially eliminates the very purpose of the remedy offered under Rule 17.9—to allow the defense an "opportunity to interview the newly discovered witness." Judge Jackson was not a "newly discovered" witness, nor was it necessary for Walker to interview her because he already knew what her testimony would be. Additionally, "where [a] discovery violation results in the admission of evidence that is merely cumulative, the error is harmless." *O'Neal v. State*, 977 So. 2d 1252, 1255 (¶13) (Miss. Ct. App. 2008). Judge Jackson's testimony in this case was cumulative to the extent that Cecelia Bounds, the Greene County Circuit Court Clerk, testified that the electronic signature on the order was

52

not Judge Jackson's signature, and that she conferred with Judge Jackson, who confirmed that the electronic signature on the order was not hers.

¶112. For these reasons, we find that any purported error created by the admission of Judge Jackson's testimony was "harmless in nature," *id.*, and Walker's assertions with respect to this issue are without merit.

## VII. Funds for Walker to Employ an Independent Investigator

¶113. Walker is an indigent defendant. He asserts that he needed an independent investigator because of an alleged conflict of interest with a State investigator who was purportedly assigned to his case and because he needed assistance in examining the cell phone extraction report. Walker asserts that the trial court erred in denying his motions[11] seeking funds to employ an independent investigator—even though the trial court had already granted Walker's previously filed motion for funds to have the cell phone forensically examined by an independent lab. For the reasons addressed below, we find this assignment of error without merit.

¶114. "A trial court's decision to deny a request for funds to hire an expert is reviewed for an abuse of discretion." *Eubanks v. State*, 291 So. 3d 309, 315 (¶18) (Miss. 2020). Cases in which this relief is warranted "can only be left to the discretion of the trial court, *and they will be rare*." *Id.* at 315-16 (¶18) (emphasis added). In this regard, "[a]n indigent's right to

_____

[11] At the hearing on these motions, Walker acknowledged that the motions were "basically the same," so he combined them at that time.

defense expenses is 'conditioned upon a showing that such expenses are needed to prepare and present an adequate defense.'" *Id.* at 316 (¶20) (quoting *Green v. State*, 631 So. 2d 167, 171 (Miss. 1994)). Specifically, "[a] party seeking assistance 'is required to offer *concrete reasons* for requiring such assistance, not undeveloped assertions that the requested assistance would be beneficial.'" *Id.* (emphasis added) (quoting *Hansen v. State*, 592 So. 2d 114, 125 (Miss. 1991)). The Court must "weigh[] on a case by case basis whether the denial of expert assistance for an accused is prejudicial to the assurance of a fair trial," *id.*, and relief will be granted "only where the accused demonstrates that the trial court's abuse of discretion is so egregious as to deny him due process and where his trial was thereby rendered fundamentally unfair." *Id.*

¶115. Walker has failed to meet this test here. We begin by recognizing that the trial court had already granted Walker's motion requesting funds to have the cell phone independently forensically analyzed, ordering that up to $1,200[12] be allocated for Walker to do so. Walker indeed had the cell phone forensically analyzed.

¶116. Walker then filed the motions at issue here, seeking additional funds for him to hire an independent investigator (1) to investigate the charges against him due to an alleged conflict of interest with one of the purported State investigators on his case and (2) to assist him with examining the cell phone extraction report that the State had furnished to the

---

[12] At the hearing on that motion, Dobbins, on Walker's behalf, requested funds ranging from $1,200 to $2,000 for a forensic examination of the cell phone by an independent lab.

54

defense. We find no abuse of discretion in the trial court's denying these motions. As we address below, we find that neither reason offered by Walker is a "concrete reason" supporting an allocation of funds for an independent investigator in this case. *Id.*

¶117. There is no evidence in the record supporting Walker's first reason for needing the funds, namely an alleged conflict of interest with a purported State investigator on the case. Walker contended at the hearing on his motions that one of the State's investigators (Jonathan Hunt) "had a conflict of interest in this case as [Walker] had previously . . . accused . . . [him] of sexual assault and misconduct." We find no evidence in the record that Investigator Hunt was involved in the subject case. The State expressly told the trial court at the hearing that this particular investigator was not on Walker's case, nor was this investigator's name mentioned in discovery. We find that Walker's unsubstantiated assertions on this point certainly do not establish a "concrete reason" for allowing Walker funds for an independent investigator.

¶118. Regarding his second basis for seeking funds for an independent investigator, Walker asserts that it was necessary for an investigator to independently review the cell phone extraction report that the State had furnished the defense to see if "material had been deleted" and to show that other inmates had used the cell phone. Dobbins (Walker's standby counsel who assisted Walker at the hearing) explained to the trial court that the State had furnished the cell phone extraction report to the defense, and it consisted of ten gigabytes of data on a USB drive.

¶119. We find no support in the record for Walker's "deleted data" assertion as a proposed reason for additional funds to be allocated for Walker to hire an independent investigator. Dobbins assured the trial court that "[t]he data has been retrieved [from the cell phone]. Everything that was on the phone has been retrieved." And the State explained at the hearing that one of the reasons the extraction report was so large was that it *did* include deleted data. Further, as noted above, the trial court had already granted Walker's motion for funds for him to obtain an independent forensic analysis of the cell phone, and Walker had done so. The trial court pointed this out at the hearing:

> THE COURT: I thought part of [your motion for funds for a forensic analysis that the trial court granted] was that you wanted to make sure that [the cell phone] wasn't tampered with and people didn't intentionally railroad you or put things on there . . . .
>
> WALKER: That was part of it and to make sure that I got the complete copy of stuff, nothing was left out . . . .

Based upon our review of the record and these exchanges, we find that Walker's unsubstantiated and "undeveloped assertions" regarding any purported deleted data in the extraction report in no way constitutes a "concrete reason" that Walker's "requested [monetary] assistance would be beneficial." *Id.*

¶120. We also find no merit in Walker's other contention—that an independent investigator was necessary to show that other inmates besides him had used the phone. At the motion hearing, the trial court pointed out to Walker that in light of the "tons of information" in the State's extraction report, Walker "could [already] make that argument." The trial court also

reminded Walker that it was the State's burden, not Walker's, "to prove the relevant documents came from you [(Walker)] somehow."

¶121. Walker ultimately told the trial court that he would not be able to review the cell phone extraction report before trial due to scheduled "surgeries" and physical therapy that he was undergoing. At that point, the trial court then specifically advised Walker that he could have Dobbins review the information and act as Walker's investigator, *and Walker agreed*:

THE COURT: You can request Mr. Dobbins to review all that information. If he finds anything relevant that he can help you with, he can act as your investigator. He can take whatever role you wish him to play. He's available here to ensure that you have access to the courts, Mr. Walker.

WALKER: Okay.

¶122. Not only did Walker agree to have Dobbins serve as his investigator, but Dobbins served as Walker's hybrid counsel at trial. Dobbins thoroughly cross-examined Investigator Smith (the State's primary witness who testified about the contents of the extraction report) during the State's case-in-chief and specifically called into question the way in which Investigator Smith purportedly linked certain emails and documents to Walker. Additionally, Walker called Investigator Smith as a witness in his own case. During Walker's direct examination of Investigator Smith, Walker established that other inmates had used the phone and some information on the phone was not linked to Walker.

¶123. Further, the record reflects that a review of the extraction report did not require

"expert" services. The State did not call Investigator Smith as an expert, nor did the State call any expert to review and explain the contents of the extraction report. When Walker called Investigator Smith as a witness and asked him whether he had any "formal training or skills in interpreting the information in the report," Investigator Smith responded, "I haven't had any formal training but the report itself is self-explanatory. It tells you in the report what different things are."

¶124. For all the reasons stated, we find no abuse of discretion in the trial court's decision to deny Walker's motions for funds to hire an independent investigator, and we certainly do not find the "egregious" abuse of discretion Walker was required to show with respect to this issue. *Id*. This assignment of error is without merit.

### VIII. The Make-up of the Jury Venire

¶125. Walker asserts that Mississippi Code Annotated sections 13-5-1 and 13-5-8 (Rev. 2019) are unconstitutional and that his right to a jury venire composed of a fair cross-section of the community was violated. We find these assertions are without merit.

¶126. We start by summarizing the proceedings in the trial court relating to this issue. Walker filed a "Motion to Challenge the Array of the Jury" on February 7, 2020, four days before trial was to begin. At the pre-trial hearing on his motion, Walker asserted that the jury pool did not consist of a fair cross-section of Greene County citizens due to "a systematic exclusion" of "poor people," "blacks," and " young adults aged eighteen to thirty." The trial court asked Walker what proof he had to support these assertions. Walker responded, "I just

58

know the people that have went to trial at SMCI and they basically, when I asked about their jury, what they tell me their jury consisted of. I don't have any statistical showing."

¶127. The trial court asked how many people Walker had talked to about their trials and the time period when their trials occurred. Walker said he had talked to about five inmates but could only name one individual whose trial was "about five, six years ago." In response to Walker's arguments, the State argued that Walker's proof was hearsay, at best, and that in the State's review of the venire list, it found that it included potential jurors between the ages of twenty-one and thirty. Race was not included on the venire list.[13]

¶128. The trial court denied Walker's motion, finding no evidence of systematic exclusion of a distinctive group. *See Yarbrough v. State*, 911 So. 2d 951, 955 (¶7) (Miss. 2005). Walker then asked, "In the event that I can get some of this information, could I re-urge this motion later?" The trial court denied Walker's request.

¶129. After the jury was selected, the trial court asked whether there was anything else to cover before the jury was seated. Walker stated, "Yes, Your Honor. Just for the record, . . . yesterday we talked about the jury pool and . . . there were no black males in the jury pool and there was only three [or] four African American females. . . . I'm just stating it for the record." The trial court responded, "Okay. Well, the Court's made its rulings on your motions so we will seat this jury."

### A. Mississippi Code Annotated Sections 13-5-1 and 13-5-8

---

[13] The record does not contain the venire list.

¶130. Walker asserts that sections 13-5-1 and 13-5-8 are unconstitutional for their alleged exclusion of distinctive groups. Specifically, he asserts that section 13-5-1 is unconstitutional because it excludes individuals between the ages of eighteen and twenty. *See* Miss. Code Ann. § 13-5-1 (A "competent juror" includes "[e]very citizen not under the age of twenty-one years," who also meets the other listed qualifications.). Walker asserts that section 13-5-8 is unconstitutional because the master list used for jury service selection is created using the voter registration list. *See* Miss. Code Ann. § 13-5-8. According to Walker, using the voter registration list is unconstitutional because it automatically excludes individuals who traditionally do not register to vote, individuals who have recently moved into the county, and those who do not meet the residency requirements. We find Walker's unconstitutionality assertions are without merit.

¶131. "[T]he 'party challenging the constitutionality of a statute must prove his case by showing the unconstitutionality of the statute beyond a reasonable doubt.'" *Parker v. State*, 917 So. 2d 120, 123 (¶10) (Miss. Ct. App. 2005) (quoting *Jones v. State*, 710 So. 2d 870, 877 (¶29) (Miss. 1998)). Walker wholly fails to meet this standard with respect to both statutes he challenges.

¶132. Walker's assertion that section 13-5-1 is unconstitutional because it excludes individuals between eighteen and twenty is not supported by Mississippi law. The Mississippi Supreme Court recognized in *Milano v. State*, 790 So. 2d 179, 188 (¶41) (Miss. 2001), that "[t]his Court has previously considered the exclusion of persons under age 21

60

from jury service and has consistently held that the exclusion does not violate the state or federal constitution." (citations omitted).[14]

¶133. Regarding section 13-5-8, Walker's vague assertion that "young adults, blacks, [H]ispanics, poor people, and other segments of the community" traditionally do not vote is insufficient proof that section 13-5-8 is unconstitutional. Walker points to no evidence in the record supporting this assertion, nor do we find any such evidence based upon our own review of the record. Walker has failed to meet his burden of showing that section 13-5-8 is unconstitutional beyond a reasonable doubt. *See Parker*, 917 So. 2d at 123 (¶10).

¶134. For the reasons stated, Walker's challenge to the constitutionality of sections 13-5-1 and 13-5-8 is without merit.

## B. The Jury Venire and Walker's Challenge Regarding a Fair Cross-Section of the Community

¶135. Walker asserts that his constitutional rights were violated because the jury venire was not a fair cross-section of Greene County's citizens. To show a prima facie violation of the fair cross-section requirement, a defendant must show

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury selection process.

---

[14] To the extent that Walker also challenges the constitutionality of section 13-5-1's exclusion of illiterate individuals, this exclusion has been upheld as constitutional. *Wilson v. State*, 574 So. 2d 1324, 1331 (Miss. 1990).

*Yarbrough*, 911 So. 2d at 955 (¶7) (citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).

¶136. "While the United States Supreme Court has not precisely defined 'distinctive group' under the first prong of the test, it has stated that such may include 'economic, social, religious, racial, political, and geographical groups.'" *Presley v. State*, 9 So. 3d 442, 444 (¶5) (Miss. Ct. App. 2009) (quoting *Thiel v. S. Pac. Co.*, 328 U.S. 217, 220 (1946)). We recognize that "African Americans clearly constitute a distinctive group in the community," *Ellis v. State*, 989 So. 2d 958, 966 (¶24) (Miss. Ct. App. 2008), and that indigent persons could also fall within this description. But even if Walker has met the first requirement as to some of the groups he alleges were excluded, Walker wholly failed to furnish support for the remaining two requirements.

¶137. In *Ellis*, the Court addressed the defendant's "fair cross-section of the community" claim and found that he had satisfied the first requirement of *Duren* in asserting that African Americans had been excluded from the jury venire. *Ellis*, 989 So. 2d at 966 (¶¶23-24). The Court then explained, however, that "[n]ot only must [the defendant] show that the number of African Americans on his venire was not a fair and reasonable representation of Harrison County," but the defendant "must also show that this under representation was present not only on his jury, but it was the general practice in other venires as well." *Id.* at (¶25) (citing *Yarbrough*, 911 So. 2d at 955(¶7)). Like the defendant in *Ellis*, Walker "falls remarkably short" with respect to this requirement. *Id.* Walker failed to provide the trial court with any data or evidence that African Americans, individuals between the ages of twenty-one and

thirty, or indigent individuals were underrepresented on jury venires compared to the number of those persons in Greene County.

¶138. Nor did Walker offer any proof to the trial court to establish the third element of the *Duren* test—that the alleged underrepresentation of the groups he has identified is based on systematic exclusion in the jury selection process. As noted, at the hearing on his motion, Walker admitted that he had no statistics to prove his assertions and could only provide anecdotal information from other inmates. Walker asserts, however, that the trial court abused its discretion when it did not allow him to "get some of this information" and re-urge his motion—although trial was to begin the next day. We find Walker's assertion is without merit.

¶139. To start, Walker did not preserve this issue for appellate review. Even if Walker's request to re-urge his motion if he were able to "get some of this information" could be considered an actual motion, it in no way identifies what "information" Walker intended to furnish the trial court, other than, perhaps, statements from the five or six inmates that had purportedly told him about the jury venires in their trials.[15] But even with respect to any

---

[15] After supplemental appellate briefing on this issue was finished, Walker filed a motion with this Court requesting that he be allowed to supplement the appellate record with "all exhibits, reports, papers, documents, affidavits and sworn statements" related to the jury-selection process, composition of grand and petit juries, population makeup, and voter registration rolls in Greene County from January 1, 2015, to December 31, 2020. No such request was ever made in the trial court, and no such information was in the trial court record. The request was therefore denied. *See Phillips v. State*, 421 So. 2d 476, 478 (Miss. 1982) ("[C]onsideration of matters on appeal is limited strictly to matters contained in the trial court record[.]").

purported inmate statements, Walker did not describe what these inmates said in any detail, nor did he proffer any such statements as required by Mississippi Rule of Evidence 103(a)(2).[16]

¶140. Walker also appears to assert in his supplemental appellant's brief that prior jury lists will reveal a pattern of systematic exclusion, but the record contains no data or proof of such an assertion. Walker did not attach any jury lists to his motion, or proffer and jury lists that could purportedly support his assertions. Walker simply did not preserve this point for appeal. *See Green v. State*, 89 So. 3d 543, 554 (¶28) (Miss. 2012) ("When testimony is not allowed at trial, a record of the proffered testimony must be made in order to preserve the point for appeal.") (quoting *Metcalf v. State*, 629 So. 2d 558, 567 (Miss. 1993)).

¶141. We therefore examine this issue for "plain error." *Corrothers v. State*, 148 So. 3d 278, 319 (¶112) (Miss. 2014). "The plain error doctrine requires not only the existence of an error, but also that either the error resulted in a manifest miscarriage of justice or 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *Brown v. State*, 995 So. 2d 698, 703 (¶21) (Miss. 2008)).

¶142. In this case, we find *no* error in the trial court's denial of Walker's request to furnish "some information" at some future date made just one day before trial. Accordingly, we find

---

[16] Rule 103(a)(2) provides that "[a] party may claim error in a ruling to . . . exclude evidence only if the error affects a substantial right of the party and . . . if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context."

no "plain error" with respect to this issue. *See id*. at (¶113) ("Because no error occurred, we do not recognize plain error.").

¶143. Walker asserts that having only four African American females out of 150 individuals in his jury venire proves the systematic exclusion of African American individuals from jury venires. But as we have discussed above, Mississippi and federal law requires Walker to show more: even if the racial makeup of Walker's venire constituted probative evidence that Walker's venire was "not a fair and reasonable representation of [Greene] County," *Ellis*, 989 So. 2d at 966 (¶24), Walker must also show "that this under representation . . . was the general practice in other venires as well." *Id.* at (¶25) (citing *Yarbrough*, 911 So. 2d at 955 (¶7)); *see Duren*, 439 U.S. at 364.

¶144. In short, "[a] single venire wherein a distinctive group is under represented does not constitute systematic exclusion of that group from the jury-selection process." *Simmons v. State*, 13 So. 3d 844, 848 (¶16) (Miss. Ct. App. 2009). Indeed, "a defendant is not entitled to a given percentage of jury members of his own race," *Yarbrough*, 911 So. 2d at 956 (¶12) (citation omitted), and "[t]here is no constitutional right to have a jury mirror any particular community." *Carr v. State*, 655 So. 2d 824, 840 (Miss. 1995). As this Court recognized in *Gavin v. State*, 767 So. 2d 1072, 1077 (¶12) (Miss. Ct. App. 2000), "[w]e can find no law that requires a venire or a petit jury to precisely reflect the racial composition of the county in which an accused is tried. Even if this was the law, [the defendant] offered no evidence of the racial composition of Grenada County." The same circumstances are present in the

instant case. Walker did not offer any evidence in the trial court of the racial composition of Greene County or evidence of "systematic exclusion" of any distinctive group in the jury selection process. Accordingly, we find this assignment of error is without merit.

¶145. In conclusion, we reject each of Walker's eight assignments of error in this appeal.

¶146. **AFFIRMED.**

**BARNES, C.J., GREENLEE, McCARTY AND SMITH, JJ., CONCUR. WILSON, P.J., McDONALD AND EMFINGER, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., NOT PARTICIPATING.**